RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0308p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHRISTOPHER LEE-MURRAY BEY,

　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

ADAM FALK and CHARTER TOWNSHIP OF CANTON,
OHIO (18-1376); ANDREW MCKINLEY, ERIC EISENBEIS,
and MEGAN MCATEER (18-1285),

　　　　　　　　　　*Defendants-Appellants*.

> Nos. 18-1285/1376

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-13743—Denise Page Hood, Chief District Judge.

Argued:  January 31, 2019

Decided and Filed:  December 31, 2019

Before:  CLAY, COOK, and LARSEN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Eric S. Goldstein, CITY OF LIVONIA, Livonia, Michigan, for Appellants in 18-1285.  Holly S. Battersby, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellants in 18-1376.  Joel B. Sklar, JOEL B. SKLAR LAW, Detroit, Michigan, for Appellee.  **ON BRIEF:**  Eric S. Goldstein, CITY OF LIVONIA, Livonia, Michigan, for Appellants in 18-1285.  Holly S. Battersby, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellants in 18-1376.  Joel B. Sklar, JOEL B. SKLAR LAW, Detroit, Michigan, for Appellee.

　　LARSEN, J., delivered the opinion of the court in which COOK, J., joined.  CLAY, J. (pp. 21–38), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge.   Christopher Lee-Murray Bey filed a lawsuit under 42 U.S.C. § 1983, alleging that: (1) several police officers stopped him without reasonable suspicion of criminal activity, in violation of the Fourth Amendment; and (2) they investigated and ultimately stopped him because of his race, in violation of the Fourteenth Amendment.   The officers moved for summary judgment based on qualified immunity; the court below denied the motion. We DISMISS in part, AFFIRM in part, REVERSE in part, and REMAND.

I.

"[A] defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Hooper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018).   Accordingly, we present the facts in that light.

At approximately 2:30 a.m. on March 16, 2013, Bey and two friends went out in Bey's minivan to purchase space heaters for their apartment.   Bey had purchased the older minivan just a few days before, so it had a temporary registration tag but no license plate.   The three first went to a Meijer store in Livonia, Michigan, a western suburb of Detroit, but came away empty-handed.   So they drove across the street and sat in the parking lot of a closed Livonia Walmart while they tried to locate a nearby store that would be open at that time of night.   They then drove to a Walmart in neighboring Canton, where they found and purchased the space heaters they wanted.   Just as they were about to drive home, they were surrounded and stopped by Canton police officers.

Unbeknownst to Bey and his friends, while en route to the Livonia Meijer the minivan they were driving had caught the eye of an undercover Livonia police officer, Sergeant Andrew McKinley.   McKinley led an undercover team of Livonia police officers called the Special Operations Unit (SOU), which conducted surveillance in the interest of crime prevention. Livonia had recently experienced an unusual number of break-ins at cellphone stores, so the

SOU officers on duty that night—McKinley, Megan McAteer, and Eric Eisenbeis, each driving a separate unmarked vehicle—were paying particular attention to possible retail crimes.

When Sergeant McKinley observed Bey's "beat-up" minivan at the early morning hour, he started to follow it on "a hunch"; according to his training and experience, criminals often use stolen, older vehicles for retail crimes so that police cannot trace the vehicles back to them. At some point before Bey and his friends entered Meijer, the officers noted that the minivan's passengers were black. While Bey and his friends were in Meijer, McKinley approached the minivan and observed a paper temporary registration taped to the window. McKinley later testified that one of the SOU officers ran the registration through the Michigan state database but found no matching records.[1] Eisenbeis, on the other hand, recalled that McKinley said over the radio that the problem with the temporary license plate was that "it was unreadable." According to Bey, the temporary license plate was valid and clearly visible.

The officers continued to follow Bey's minivan from a distance as it drove from the Livonia Meijer to the Livonia Walmart parking lot, and then finally to the Canton Walmart. At one point, the minivan got on a northbound freeway, took the first exit, and then immediately reentered the southbound freeway. To the SOU officers this resembled a "cleaning move," a tactic used to draw out or shake off officers who might be following.

When the minivan arrived at the Canton Walmart and its occupants (Bey and his friends) entered the store, Officer McAteer followed them in on foot, at McKinley's direction, to observe them. She passed information to McKinley via cell phone as she followed them through various areas inside Walmart, and McKinley then passed some of the information along to the rest of the SOU team via radio. McAteer told McKinley that she watched the young men separate, with one of the three going into the hunting section and looking at guns. The three then proceeded to the electronics section, where McAteer saw nothing unusual. Though at one point she might have relayed that she thought the three were contemplating a "pushout," she never saw the three leave or attempt to leave Walmart without paying for the merchandise in the shopping cart. To the contrary, she relayed to McKinley that Bey and his friends stood in line at the cash register,

---

[1]There were no matching records in the state database because Bey had bought the minivan just before this incident, and there is generally a delay of several days before recently registered vehicles appear in the database.

"flipped[] through some [credit] cards to . . . pick a card," and paid for the items in their shopping cart using the card.

Meanwhile, the SOU officers outside had called the Canton Police Department and requested that uniformed Canton officers be nearby; the SOU officers did not want to contact Bey and his friends, if possible, because they were in plain clothes and protocol generally dictates that uniformed officers approach suspects. The Canton Police Department dispatched several uniformed officers to Walmart, including Adam Falk. When Falk arrived at Walmart, he spoke briefly with Eisenbeis, who told him that McAteer and the suspects were in the store. Eisenbeis gave him a "prep radio" so he could hear McKinley's instructions, and Eisenbeis told Falk to wait nearby so he could make contact with Bey and his friends when they came out of the store.

Falk waited outside Walmart for fewer than six minutes before McKinley notified Falk that Bey and his friends had exited the store and directed him to stop them. Falk and the other Canton police officers surrounded Bey's van and ordered him out of the vehicle. Since Bey was carrying a concealed weapon, he properly notified Falk that he was armed and pointed to his holster so Falk could remove the weapon; Bey also produced a concealed weapon license. Falk asked to see Bey's receipts for the space heaters, which showed no signs of fraud. However, Falk discovered that Bey's concealed weapon license had expired and so arrested him.

Bey was charged in Michigan state court with the felony offense of unlawfully carrying a concealed weapon. He moved to suppress the evidence against him, asserting that the stop was unreasonable under the Fourth Amendment. For unknown reasons, the county prosecutor presented only Falk's testimony (and not McKinley's) at the suppression hearing, even though Falk had stopped Bey at McKinley's direction. Falk truthfully testified that he personally had seen no suspicious activity. The state court found the stop unconstitutional and suppressed the evidence; the case was later dismissed with prejudice.

Bey then filed this civil rights action against McKinley, Eisenbeis, McAteer, and Falk, alleging violations of his Fourth Amendment and equal protection rights. The officers moved for

summary judgment based on qualified immunity; the district court denied that motion as well as the officers' subsequent reconsideration motions. The officers timely appealed.

II.

We review the district court's summary judgment decision de novo, applying the same standards the district court used. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). "[S]ummary judgment is warranted only if 'there is no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a) and *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). We also review de novo the grant or denial of qualified immunity. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted). When an officer raises a qualified immunity defense, we determine "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (quotation marks omitted). We may grant qualified immunity on either basis and may address the prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009).

This case's interlocutory posture limits our appellate jurisdiction. The Supreme Court has interpreted 28 U.S.C. § 1291's grant of appellate jurisdiction over "final decisions" to include *some* summary judgment orders denying qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985); *Harrison v. Ash*, 539 F.3d 510, 516–17 (6th Cir. 2008). The general rule is that we do not have statutory jurisdiction to entertain interlocutory challenges to a district court's factual findings and may only address "neat abstract issues of law." *Johnson v. Jones*, 515 U.S. 304, 317 (1995) (citation omitted). For this reason, "a defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Hooper*, 887 F.3d at 757 (alteration omitted). Taking the facts in that light, we assess whether Bey has carried his burden

of showing that the officers are not entitled to qualified immunity as a matter of law.  *Hayden v. Green*, 640 F.3d 150, 152–53 (6th Cir. 2011).

III.

We first address the Fourth Amendment claims arising out of the allegedly unlawful stop. For the reasons that follow, we conclude that McAteer, Eisenbeis, and Falk are entitled to qualified immunity against these claims.  The claim against McKinley, however, must go to a jury.

A.

McKinley argues that he is entitled to qualified immunity because he had reasonable suspicion of criminal activity to order the stop.  We have said that the Fourth Amendment divides police-citizen interactions into three tiers, which must be justified by correspondingly increasing levels of suspicion:  "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause."  *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quotation marks omitted).  Considering the facts in the light most favorable to Bey, what happened was a non-consensual investigative detention,[2] and so there must have been reasonable suspicion for the stop.  *See United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009).

"[R]easonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011).  This standard requires "more than a mere hunch," but at the same time "is satisfied by a likelihood of criminal activity less than probable cause" and far less than "a preponderance of the evidence."  *Dorsey v.*

---

[2]McKinley argues that he did not actually order an investigative stop, but rather merely directed Falk to make contact with Bey—in other words, to conduct a "consensual encounter, which may be initiated without any objective level of suspicion."  *Smith*, 594 F.3d at 535 (quotation marks omitted).  Bey asserts that McKinley forfeited this argument by not raising it in his principal summary judgment motion.  We need not decide the forfeiture issue because, viewing the evidence in the light most favorable to Bey, the argument would be meritless anyway.  McKinley testified that what happened was a stop; Falk testified he was directed to stop Bey; and in the light most favorable to Bey, it was a stop.

*Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006)). "In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005).

Taking the version of the events most favorable to Bey, McKinley violated Bey's Fourth Amendment rights by directing a stop without reasonable suspicion.**3** When McKinley directed Falk to initiate the stop, he knew only that three young men had driven an old minivan to three different stores in the early morning, at one time reversing direction on the highway. McAteer had followed them around the third store and had not observed any criminal, or even suspicious, behavior; in fact, she had watched them stand in line at the cash register, "flip[] through some [credit] cards to . . . pick a card," and pay for the items in their shopping cart with the card. And she had relayed this information to McKinley. There was simply nothing here to give a reasonable officer in McKinley's shoes the impression that criminal activity "may be afoot" such that an investigative stop would be constitutionally reasonable. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

True, we must "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). And McKinley presents several reasons why some of Bey's actions could have been consistent with more devious motives. For example, McKinley testified that "[c]riminals frequently use stolen old vehicles that cannot be traced to them if they flee the scene," and points to his testimony that the paper registration on the van's window did not appear in a records search. He likewise contends that Bey's reversal on the interstate was "consistent with a cleaning maneuver." But even taken together, these meager observations are not enough to constitute reasonable suspicion. The deference we owe to police officers on the ground can only

---

**3**We reach this conclusion independent of the state court's determination that the stop violated the Fourth Amendment. Neither party argues on appeal that the state court's determination should have any effect on our analysis.

stretch so far, and here McKinley had seen nothing constituting an "objective manifestation" that Bey "[wa]s, or [wa]s about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417. Driving from store to store, even at 2:30 a.m. (when the stores were, after all, open to customers), in a "beat-up" minivan, would not generate reasonable suspicion to stop a suspect when that series of events culminated in a normal credit card purchase.[4] Every reasonable officer would recognize that ordering a stop in this situation, to investigate possible shoplifting *after* the officer learned that the suspect had paid, would violate clearly established Fourth Amendment rights. *See District of Columbia v. Wesby,* 138 S. Ct. 577, 590 (2018). As such, McKinley is not entitled to qualified immunity on this claim.

Lastly, McKinley argues that he could have lawfully stopped Bey independent of the retail fraud investigation. The temporary tag number did not appear in the state database and so, McKinley says, he had probable cause to stop Bey for driving an unregistered vehicle. It is true that an officer's subjective motivations for initiating a stop are "irrelevant to the existence of probable cause," or, in this case, reasonable suspicion. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). So long as there were facts known to McKinley that objectively constituted probable cause of a civil infraction or reasonable suspicion of a criminal offense, *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012), the stop would not violate the Fourth Amendment, *see id.* at 154–55; *Alman v. Reed*, 703 F.3d 887, 900 n.3 (6th Cir. 2013) ("Indeed, a wrongful-arrest claim can fail if probable cause existed for a crime other than the crime for the which the individual was arrested or charged.").[5] But viewing the record in Bey's favor, there is a genuine issue of

---

[4]McKinley also argues that "the fact that the [credit card] purchase went through does not rule out fraud," because "the cashier does not typically compare the account number on the swiped card with the one that shows up on the receipt." It may be true in the abstract that a seemingly successful credit card transaction does not exclude all possibility of fraud. But even deferring to the officers' experienced judgments as we must, *see Arvizu*, 534 U.S. at 273, McKinley's assertion crosses into baseless speculation in these circumstances. Under the same logic, even a cash payment would not have definitively ruled out theft because the bills might have been counterfeit—so *nothing* Bey could have done in the store could have prevented the officers from stopping him.

[5]The district court's analysis faltered when it dismissed these arguments, saying that "[a]lthough Defendants argue they could have stopped the minivan at any time for this suspected civil infraction, they never effectuated a stop on that basis." Under *Devenpeck*, the fact that the officers never actually conducted a stop on that basis is irrelevant; the question is whether a reasonable officer, with the knowledge these officers possessed, would have had reason to believe that a stop would be justified. 543 U.S. at 153. The district court repeated the error upon reconsideration:

> The Livonia Defendants again are asking the Court to ignore any intent of officers and, implicitly, suggesting that officers should be able to create a laundry list of possible violations

material fact on whether there *was* evidence from which a reasonable officer could justifiably believe Bey's van was unregistered. On the one hand, McKinley testified that one of the officers, though he was not sure who, had asked the dispatcher to run the temporary license plate and it came back "no record." On the other hand, McKinley affirmatively testified that Bey "hadn't done anything wrong" and that he had "absolutely not" committed any crime in Livonia. And Bey points out that, besides these conflicting statements, there is nothing else in the record—like a search printout or a recording of the call to dispatch, for example—to directly indicate that any registration search came up empty-handed. Eisenbeis recalled the license plate situation a little differently as well; he testified that McKinley told the SOU that the problem with the temporary license plate was that "it was unreadable." Taking the evidence in the light most favorable to Bey, a material question of fact remains, and it would be inappropriate to resolve this issue on summary judgment.

## B.

On the other hand, McAteer and Eisenbeis are entitled to summary judgment because Bey has not shown that they personally participated in the actions that violated his Fourth Amendment rights. Bey's Fourth Amendment arguments consistently lump the SOU officers together. But "[t]o establish liability against an individual defendant acting under color of state law, a plaintiff must show that the defendant was 'personally involved' in [unlawful conduct]." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

The district court denied qualified immunity to McAteer because (1) she was present throughout the events and (2) she conducted surveillance inside the Canton Walmart and described the events to the other SOU officers, including "suggesting that a 'pushout' or other

---

after-the-fact to justify their stop. But, to completely ignore the intent of officers and the reasons they gave (or did not give) for following Plaintiff and his companions (and the actions or inactions of the officers, which may demonstrate or permit inference of intent) would insulate officers from a finding of discriminatory conduct in virtually every case, regardless of the evidence.

The Supreme Court has repeatedly required that courts assess Fourth Amendment claims without regard to the officers' subjective intent. *See, e.g., Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *see also Devenpeck*, 543 U.S. at 153. And it has instructed that "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren*, 517 U.S. at 813.

retail fraud and credit card fraud—was possible, even likely." This conduct, however, does not amount to a Fourth Amendment violation. First, "mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." *Burley*, 729 F.3d at 620. Second, conducting nonintrusive surveillance in places open to the public does not violate the Fourth Amendment. *See, e.g.*, *United States v. Houston*, 813 F.3d 282, 289 (6th Cir. 2016) ("[P]olice may view what the public may reasonably be expected to view."); *United States v. Ellison*, 462 F.3d 557 (6th Cir. 2006) (holding that a motorist has no reasonable expectation of privacy in his license plate number because "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection" (second alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 351–52 (1967))); *Kyllo v. United States*, 533 U.S. 27, 31–32 (2001) (stating that "the lawfulness of warrantless visual surveillance of a home has still been preserved" despite other developments in Fourth Amendment doctrine). It necessarily follows that communicating those observations to other officers likewise does not implicate any Fourth Amendment interests. *Cf. Ellison*, 462 F.3d at 563 ("[S]o long as the officer had a right to be in a position to observe the defendant's license plate, any such observation *and corresponding use of the information* on the plate does not violate the Fourth Amendment." (emphasis added)). McAteer's suggestion that she thought it possible that Bey and his friends would attempt a "pushout" or other "retail fraud" cannot violate the Fourth Amendment; indeed, it is undisputed that she also reported that Bey and his friends in fact paid for the merchandise before they left the store. And there is no evidence that McAteer personally participated in or directed the stop. McAteer's conduct did not violate Bey's Fourth Amendment rights.

The same goes for Eisenbeis. The district court denied qualified immunity to Eisenbeis because (1) he was present throughout the events and (2) he "drafted a police report that indicates that the dispatched offense, the subject and verified offense were 'Suspicious Circumstances' but does not contain any criminal activity committed by Plaintiff or his friends— except for the possession of the firearm by Plaintiff discovered after the stop." As explained above, mere presence is not enough. *Burley*, 729 F.3d at 620. As for the police report, it is a mere after-the-fact summary of the events that occurred on the night of Bey's arrest; we fail to see its significance for determining whether Eisenbeis's involvement in the events leading to the stop amounted to a Fourth Amendment violation. In addition, Eisenbeis's role in the events

leading to Bey's stop was minimal.  He surveilled Bey and his friends on the public street; he did not personally participate in or direct the stop.  This conduct does not amount to a Fourth Amendment violation.  *Houston*, 813 F.3d at 289; *Burley*, 729 F.3d at 619–20.  As such, both McAteer and Eisenbeis are entitled to qualified immunity.

C.

Finally, we conclude that Falk, the Canton uniformed officer who executed McKinley's direction to stop Bey, is also entitled to qualified immunity.  The district court found that a genuine issue of material fact remained as to whether Falk had reasonable suspicion to stop Bey because there was evidence that (1) Falk knew that Bey and his friends had completed their purchase at the Canton Walmart; (2) Falk had not been told that Bey and his friends had engaged in any illegal activity since the SOU officers' surveillance began; and (3) Falk did not make the stop based solely on McKinley's request.

On appeal, Falk tries try to dispute these findings, but our limited jurisdiction over appeals from denials of qualified immunity precludes us from reviewing the district court's factual determinations.  *See DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).  Accepting them as true for the purposes of this appeal, however, we may decide whether Falk's conduct violated Bey's clearly established Fourth Amendment rights.  *Id.*

The collective-knowledge doctrine permits an officer to "conduct a stop based on information obtained from fellow officers."  *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015).  Because police officers "'must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information,' we impute collective knowledge among multiple law enforcement agencies."  *United States v. Lyons*, 687 F.3d 754, 766 (alteration in original) (quoting *United States v. Hensley*, 469 U.S. 221, 230–31 (1985)).  The doctrine applies "even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for a stop."  *Id.*; *see also United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir. 1994) (en banc) ("It was permissible for [the officers] to rely upon the dispatcher's conclusion that Kaplansky was 'suspicious' without inquiring into the basis of the dispatcher's knowledge.").  It also applies when the information

the officers receives is quite skimpy. *See United States v. Butler*, 223 F.3d 368, 371 (6th Cir. 2000) (concluding that a stop was lawful even though the officers who stopped the car were only told "there was a drug investigation going on and [the state trooper] wanted that vehicle stopped" (alteration in original)). So, at the time Falk stopped Bey, a reasonable officer would have known that he could lawfully effect a stop at another officer's request because the Fourth Amendment analysis would take into account the requesting officer's knowledge as well.

But what do we make of the fact that the collective knowledge here did not amount to reasonable suspicion? In such circumstances, the Supreme Court has recognized the availability of a good faith defense for an officer who relies on the erroneous collective knowledge of others to make a stop. *See Hensley*, 469 U.S. at 232. We have said that "an officer is not subjected to liability if he, through no improper action or inaction on his part, conducts a stop that is unconstitutional due to the error of a generally trustworthy source." *Brown*, 779 F.3d at 413; *see also Hardesty v. Hamburg Township*, 461 F.3d 646, 656 (6th Cir. 2006) ("The Pinckney officers entered the house with the Hamburg officers based upon the information provided by the Hamburg officers . . . . Reliance upon such information insulates the Pinckney officers from civil liability in the event the information relied upon was defective."), *abrogated on other grounds by Florida v. Jardines*, 569 U.S. 1 (2013). "[W]here one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers," we determine qualified immunity based on "what information was clear or should have been clear to the individual officer at the time of the incident" and "what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Brown*, 779 F.3d at 413 (quoting *Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007)).

Falk's participation was quite brief. The dispatch audio files indicate that Bey and McAteer were already inside the Walmart store when the SOU officers requested Canton's assistance. The audio timestamps indicate that Falk, who was on patrol at the time, was first instructed to go to Walmart no more than fifteen minutes before the stop occurred, and that he waited outside the store for fewer than six minutes before stopping the group at McKinley's

direction. This is consistent with Falk's undisputed testimony that he waited outside the store for a short period, between five and ten minutes, before stopping Bey.

The very brief span of Falk's pre-stop involvement goes hand-in-hand with the limited substantive involvement the record reveals, even taken in the light most favorable to Bey. Falk's intended and actual role in this operation was merely to be an arm of the SOU officers—to stop Bey when McKinley gave him the green light. From Falk's perspective, after arriving at Walmart, the situation was fast-moving, and so Falk relied on the representations of suspicious activity that the Livonia officers had relayed to him.

The dispatcher told Falk that the SOU officers were "watching some guys" who were "in the electronics department" of the Canton Walmart, and that the SOU officers had requested uniformed officers. When Falk arrived, he was informed that the SOU officers "had followed these subjects around from different stores" and that there was an undercover officer following them inside Walmart. The SOU officers never told Falk that Bey and his friends had committed an illegal act while the officers were surveilling them. But Falk also knew that the SOU officers were "experienced officers that do a lot of surveillance on high crime areas," so he inferred "that they probably had some more information that [he] didn't have." It was reasonable for him to assume "there [was] a reason why they were following them around," given Falk's brief and limited involvement in the operation. In fact, Falk specifically testified that "[a]t that time [he] did not know" why the SOU officers had begun following Bey and his friends, and that he was "trusting" the information the SOU officers had relayed to him. He heard over the prep radio that the men walked around, made purchases with a credit card, and then exited the store. McKinley directed Falk to stop Bey, and Falk did so.

Despite Falk's limited involvement in the investigation and his reliance on McKinley's direction, the district court denied Falk qualified immunity based on its conclusion that there was evidence that Falk did not act *solely* on the basis of McKinley's request when stopping Bey. Presumably, the source of the district court's determination is Falk's deposition testimony about

the information McKinley had relayed to him,[6] and the inferences Falk had drawn from that information based on his law enforcement experience. Yet, even though Falk heard from McKinley what Bey and his friends were doing in the store, Falk noted that his ability to ask questions over the radio about Bey's conduct was limited because asking questions would have interfered with McKinley's ability to receive information from McAteer. And although Falk admitted that he had discretion to ask McKinley whether Bey's actions were enough to justify a stop, he testified, "I didn't have time to make that decision because, again, I was getting relayed information." Falk further testified that there was not enough time to question McKinley's direction to stop Bey because Bey and his friends were about to get in the car and leave.

Moreover, nothing in the collective-knowledge-doctrine cases says that an officer must act *solely* on other officers' knowledge when effectuating the stop.[7] Indeed, our articulation of the good faith test presupposes that officers will sometimes possess some independent information, yet still be able to rely on the collective knowledge of others. *See Brown*, 779 F.3d at 413 (stating that we assess "what information was clear or should have been clear to the individual officer at the time of the incident" and "what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information"). And nothing in Falk's conduct suggests any "improper action or inaction on his part." *Id.* Falk reasonably relied on the information the SOU officers gave him when he arrived at the store and on the information relayed by McKinley over the radio.

---

[6]The district court stated that "Falk had heard McAteer's radio contact with the officers outside the Canton Walmart." But it is undisputed that Falk heard only from McKinley.

[7]The dissent says that "[t]he collective knowledge doctrine is most applicable in a quickly unfolding situation, in which the responding officer possesses little or no knowledge of the facts giving rise to reasonable suspicion and lacks the ability to independently corroborate that information." We agree and believe that is exactly what we have here. To reiterate the facts, Falk was dispatched to the Canton Walmart to stop the suspects that the SOU officers had been following. When he arrived, he was given a prep radio and instructed to stop them when they came out. He waited for less than six minutes outside in the parking lot before getting the go-ahead for the stop from McKinley. He was clearly *not* "part" of the investigation; he arrived at the end of it and heard only snippets of updates from McAteer, filtered through McKinley, so that he would know when (not whether) to stop the young men. We do not doubt that, in some circumstances, an officer's entitlement to rely on information furnished by others must dissipate because it becomes unreasonable to do so without independent verification. But that did not occur in the fewer-than-six minutes Falk was in the Canton Walmart's parking lot; and at the very least nothing in our caselaw should have alerted Officer Falk that he was *not* entitled to rely on others in these circumstances. That is enough for qualified immunity.

Given Falk's limited involvement, there was nothing that would have alerted him to a likelihood, or even a strong suspicion, that McKinley's direction was unlawful. While Falk did hear that Bey had purchased the items at the Canton Walmart, that did not, in these circumstances, require him to question McKinley's direction to stop Bey. Falk did not know the scope of the whole investigation, and he had to act swiftly; in such a situation, Falk was entitled to act on McKinley's direction without first cross-examining him. *Lyons*, 687 F.3d at 766. Falk's reliance, therefore, was done in good faith, and he is entitled to qualified immunity. *See Humphrey*, 482 F.3d at 851.

IV.

We now turn to the equal protection claims. Bey alleges that the officers surveilled and ultimately stopped him based on his race. To prevail, Bey must show "that the challenged police action 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). He must show that the specific officers here, the "decisionmakers in *his* case[,] acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292–93, 297 (1987); *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533–34 (6th Cir. 2002). Bey has presented no direct evidence of discriminatory intent; he must, therefore, rely on indirect evidence, which can include "valid relevant statistical evidence of disparate impact or other circumstantial evidence." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997).

Our limited jurisdiction over the officers' appeal from the denial of qualified immunity severely restricts our review of Bey's equal protection claim. Fact questions, including questions of evidentiary sufficiency, are out of our hands. *See DiLuzio*, 796 F.3d at 609. This includes "which facts a party may, or may not, be able to prove." *Id.* (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). With this understanding in mind, we proceed to each officer's individual liability.

## A. SOU Officers

*McKinley.* As stated above, Bey must show discriminatory effect and discriminatory intent. *Bennett*, 410 F.3d at 818. To establish discriminatory effect, Bey offered general arrest data for the two municipalities as a whole.[8] Although the officers challenged these data as insufficient, the district court disagreed and determined that the statistics created a genuine issue of material fact as to discriminatory effect. What we may think of the sufficiency of the statistics to show discriminatory effect is no matter for this appeal. Our limited jurisdiction over this interlocutory appeal precludes us from reexamining questions of evidentiary sufficiency. *See Farm Labor*, 308 F.3d at 536 ("Because this is an interlocutory appeal, we do not consider whether the plaintiffs' evidence is sufficient to present a genuine issue for trial . . . that Trooper Keifer actually did target the plaintiffs in part because of their Hispanic appearance or that the [police force] does not investigate non-Hispanic motorists who are similarly situated to the plaintiffs.").

The same goes for McKinley's intent. The district court addressed the question of McKinley's intent having already determined that McKinley lacked reasonable suspicion to order the stop. We do not doubt that an officer's lack of reasonable suspicion (or probable cause) may be relevant to the question whether the officer acted with a racially discriminatory intent. *Cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) (noting, in the retaliatory arrest context, that the absence of probable cause may be "weighty evidence that the officer's animus caused the arrest"). But a lack of reasonable suspicion alone is insufficient to show such intent. *See, e.g.*, *Ellison*, 462 F.3d at 563 n.4 (holding that there was a "complete lack of evidence to support a racial profiling argument" even though the district court had expressly found that the officer's stated justification for the stop was not credible); *Gilani v. Matthews*, 843 F.3d 342, 349 (8th Cir. 2016) (finding insufficient evidence of discriminatory intent where the plaintiff showed "that his citation and arrest were the result of an arbitrary and unreasonable exercise of enforcement discretion," but could "identify no statement . . . expressing a discriminatory intent

---

[8]Bey's data purport to show that while Livonia's population is only 3.4% black, 53% of those arrested by Livonia police are black. He presents similar figures for Canton, which according to Bey has a population that is 4.54% black, while 34% of total suspects arrested in Canton are black. He also presents statistics indicating that Livonia and Canton's police officers themselves are overwhelmingly white.

or any animus based upon his ethnicity"); *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) ("'We do not think . . . that the combination of an arbitrary stop . . . with a difference in race between the person stopped and the officer establishes a prima facie case of racial discrimination.'" (quoting *Ford v. Wilson*, 90 F.3d 245, 248–49 (7th Cir. 1996))); *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) ("Essentially, Bingham argues that because he is African-American, the officer is white, and they disagree about the reasonableness of the traffic stop, these circumstances are sufficient to raise an inference of racial discrimination. We disagree that this is sufficient to state an equal protection claim."); *cf. Gardenhire v. Schubert*, 205 F.3d 303, 320 (6th Cir. 2000) ("The [plaintiffs'] basic argument is that the police had no logical reason to prosecute them rather than Ms. Della Sala, so the arrest must have been motivated by their interracial marriage. While such reasoning would be sufficient in establishing a *prima facie* Title VII case, the standard for a selective enforcement claim is much more demanding.").

Here, in addition to finding a lack of reasonable suspicion, the district court determined that "McKinley's explanation for why he started following the minivan in the first place," his failure to "stop the minivan once they learned of the 'no record' plates," and McKinley's suggestion that he "did not know the race of Plaintiff and his friends prior to the Canton Walmart" created a genuine issue of material fact with respect to McKinley's intent. These factual disputes, and the inferences that may be drawn therefrom, are beyond our jurisdiction on appeal. *DiLuzio*, 796 F.3d at 609. Indeed, we have held that the "limitation on our appellate jurisdiction applies with particular force to evidence sufficiency questions related to a [person's] intent, such as whether a [person] acted with a discriminatory purpose." *Farm Labor*, 308 F.3d at 537; *see also Diluzio*, 796 F.3d at 609 (stating that we lack jurisdiction to consider "fact-based ('evidence sufficiency') appeals [that] challenge directly the plaintiff's allegations (and the district court's acceptance) of what actually occurred or *why an action was taken or omitted*, who did it, or nothing more than whether the evidence could support a jury's finding that particular conduct occurred" (alterations and quotation marks omitted) (emphasis added)). As a result, we lack jurisdiction to consider McKinley's challenge to Bey's equal protection claim.

*McAteer and Eisenbeis*. The district court grouped McAteer and Eisenbeis with McKinley when discussing Bey's equal protection claim. That was legal error. "Where . . . the district court is faced with multiple defendants asserting qualified immunity defenses, the court should consider whether each individual defendant had a sufficiently culpable state of mind." *Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011) (alteration in original) (quoting *Phillips v. Roane County*, 534 F.3d 531, 542 (6th Cir. 2008)). In such circumstances, "we must make an individualized assessment of each [officer], based on [Bey's] version of the facts." *Id.* When each officer's conduct is considered individually, we conclude that McAteer and Eisenbeis are entitled to qualified immunity on Bey's equal protection claim.

Unlike McKinley, McAteer's involvement was limited and based almost entirely on the direction of others. She started following the van because of McKinley; she testified: "So when Sergeant McKinley says he is following a vehicle, at that point, I'm going to head that way in that direction of where he's at so I can assist him." McKinley "directed [her] to go inside the [Canton] Wal-Mart." Once inside, she relayed her observations of Bey's conduct to McKinley at his request. She testified, "I imagine [McKinley] was asking me for information because I was so new at surveillance at that point in time." McAteer did not direct the stop.

Bey does not explain how this conduct evinces discriminatory intent. Nor for that matter does Bey even discuss McAteer's individual liability under the Equal Protection Clause. (The district court's analysis suffered from the same fault.) Bey says only that "Defendants had no lawful reason to profile, scrutinize, target, or seize Mr. Bey." But as noted previously, that a stop violated the Fourth Amendment may be one factor in determining whether race motivated the stop; but it is not alone sufficient. And, in any event, McAteer's conduct did not violate Bey's Fourth Amendment rights. Because Bey has not shown that a genuine issue of material fact remains as to whether McAteer acted with discriminatory intent, McAteer is entitled to qualified immunity.

For the same reasons, Eisenbeis is entitled to qualified immunity on Bey's equal protection claim. Like McAteer, Eisenbeis's conduct did not violate Bey's Fourth Amendment rights. And Eisenbeis's involvement was even more minimal than McAteer's, limited to nothing more than surveillance on the public streets at the direction of McKinley. Bey has not put forth

any evidence from which a reasonable jury could infer that Eisenbeis harbored discriminatory intent.

### B. Falk

In contrast to its treatment of McAteer and Eisenbeis, the district court gave specific reasons for denying qualified immunity to Falk on the equal protection claim. Among them, the district court noted the lack of reasonable suspicion to stop Bey and his friends. But, as discussed above, Falk relied on McKinley's direction to stop Bey and his friends and acted in good faith. McKinley's lack of reasonable suspicion cannot, therefore, be evidence to show Falk's racially discriminatory intent.

The district court also found that Falk's deposition testimony raised an inference of discriminatory intent. Falk was asked, "If race played a part in your decision to make an arrest of somebody, would you admit that under oath?" Falk responded, "No." Although our jurisdiction is limited, in some rare circumstances, we are able to fix obvious factual errors by the district court. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012) ("In exceptional circumstances, an appellate court may overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is blatantly and demonstrably false."). We think this is that situation.

Before answering "No", Falk said the question "was not a fair question." He later indicated that it was not fair because "it presupposed [he] would arrest someone based on race." Thus, Falk answered "No" because he understood the question to ask him to admit that he had stopped or would stop someone based on race. This has no bearing on whether Falk *would actually* make a stop based on race or whether Falk did so in this case. The district court's conclusion that this dubious line of questioning supports an inference of discriminatory intent is blatantly contrary to the record when Falk's testimony is considered as a whole. *Id.*

The district court also noted that Falk might have been told Bey's race while Falk was driving to the Canton Walmart. But that cannot be enough to establish discriminatory intent. *See United States v. Waldon*, 206 F.3d 597, 604 (6th Cir. 2000) ("[C]ommon sense dictates that, when determining whom to approach as a suspect of criminal wrongdoing, a police officer may

legitimately consider race as a factor if descriptions of the perpetrator known to the officer include race."). As a result, we conclude that Falk is entitled to qualified immunity on Bey's equal protection claim.

\* \* \*

For the above reasons, we DISMISS for lack of jurisdiction McKinley's appeal of the denial of qualified immunity as to Bey's Fourteenth Amendment equal protection claim, AFFIRM the denial of qualified immunity to McKinley as to Bey's Fourth Amendment claim, and REVERSE the denial of qualified immunity to McAteer, Eisenbeis, and Falk as to Bey's Fourth Amendment and Fourteenth Amendment claims. We REMAND for entry of summary judgment in favor of McAteer, Eisenbeis, and Falk in full, and to allow the claims against McKinley to proceed to trial.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  On a cold winter evening, Christopher Bey and two friends drove to the 24-hour Meijer in Livonia, Michigan, to purchase portable space heaters. But the Livonia Meijer did not have space heaters in stock, so the men proceeded to the Canton Walmart to make their purchase.  Bey and his friends are black males.  This fact alone elicited the suspicion of three undercover Livonia police officers, all of whom are white.  The three officers, driving in three separate unmarked cruisers, followed Bey and his friends for an extended period of time, pursuing them across three local jurisdictions while waiting, and perhaps hoping, for the men to commit a crime.  And when the men exited the Canton Walmart with the space heaters they had purchased, a Canton officer—whom the Livonia officers had summoned—stopped Bey and his friends, ordered them out of their car, and accused them of stealing the space heaters.  But the police officers' hopes of discovering criminality had failed to materialize.  The only crime Bey and his friends had committed was shopping while black.

This case is about race.  It is about police officers allegedly targeting, surveilling, and detaining Bey and his friends because of the color of their skin.  The majority chooses to minimize this uncomfortable truth.  But the majority's failure to sufficiently acknowledge this reality neither changes, nor obfuscates, what is apparent to anyone who objectively examines the record below: the events that unfolded in the early morning hours of March 16, 2013 would never have transpired had Christopher Bey and his friends been white—or at least a jury could so find.

The majority holds that qualified immunity protects several of the officers who followed and stopped Bey, even though a jury could easily find that the officers violated clearly established law prohibiting discrimination based on race.  In reaching this conclusion, the majority distorts the lens through which this Court must view the evidence at summary judgment, misreads and misapplies the case law, and silently adopts a novel interpretation of the Fourteenth Amendment, namely that the Equal Protection Clause does not protect against racial discrimination except in the rare circumstances where direct evidence of racial animus exists.

But because direct evidence of racial discrimination is rarely apparent—those who violate equal protection rights know better than to admit to their nefarious motives—the majority's approach effectively eviscerates the Fourteenth Amendment's prohibition on racial discrimination.

My colleagues' analysis is not only legally and factually incorrect. It is also dangerous. By excusing Defendants' alleged racial discrimination, the majority allows unconstitutional race-based policing to continue unabated. And by removing the prospect of liability as a deterrent for police officers in all but the rarest of circumstances, the majority invites an increase in discriminatory conduct.

I decline to adopt the majority's skewed view of the facts. I cannot concur in the majority's untenable legal reasoning. And I refuse to condone unconstitutional race-based policing. I therefore dissent.

## I. STATEMENT OF FACTS

Because the majority opinion mischaracterizes or overlooks many crucial facts, I feel compelled to offer a countervailing factual statement. Unlike the majority's factual statement, the factual recitation below provides a full account of the events that allegedly transpired. And unlike the majority's account of the facts, which improperly views the facts and draws inferences in the light most favorable to the defendant police officers, the factual statement below properly construes the facts and inferences in the light most favorable to Bey, as this Court is obligated to do when reviewing an interlocutory appeal of the denial of qualified immunity.

Sometime after midnight on March 16, 2013, Bey and two friends drove to Meijer in the City of Livonia, Michigan, to purchase space heaters. The weather was cold and clear. The men drove in Bey's 2000 Plymouth Grand Voyager. Bey had purchased the van a few days earlier. Bey and his friends are black males. When these events occurred, the men were 19, 23, and 26 years old, respectively.

McKinley was the officer in charge of the City of Livonia's Special Operations Unit ("SOU"), an undercover squad of plainclothes officers that specialized in surveillance of

criminal activity. The SOU consisted of McKinley, Eisenbeis, and McAteer (the "SOU officers"), all of whom are white.

When Bey and his friends entered Livonia, McKinley "turned around" and "began to follow" Bey's vehicle. (McKinley Dep., R 38-6 at PageID #437, pp. 16–17.) McKinley did not observe the van speeding or driving in a suspicious manner. McKinley claims he decided to follow the van on a "hunch" because it was "kind of beat up." (*Id.* at PageID #446–47, pp. 51, 54.)

McKinley followed Bey's van into the parking lot of the Livonia Meijer. McKinley notified Eisenbeis and McAteer that he was surveilling the van containing three black males,[1] and Eisenbeis and McAteer—each driving their own unmarked vehicle—proceeded to the Meijer to assist in the surveillance.

At some point after McKinley began following the van, he noticed that it had a temporary license plate prominently displayed in the back window. McKinley instructed one of the other SOU officers to run the license plate through the Law Enforcement Information Network database. McKinley knew that it could "take a few days" for the database to update after a vehicle is bought or sold. (*Id.* at PageID #447, p. 54) Unsurprisingly, the result allegedly came back "no record."[2] (*Id.*) But the SOU officers did not stop Bey for the possible license plate violation because, according to McKinley, Bey and his friends "hadn't done anything wrong."

---

[1]The parties dispute exactly when McKinley learned that Bey and his friends were black. McKinley testified that he did not observe the men's race until after the license plate search came back "no record." (McKinley Dep., R. 38-6 at PageID #447, pp. 54–55.) McKinley allegedly received the "no record" result after Bey and his friends parked the van and entered the Livonia Meijer. But there is no evidence in the record to corroborate McKinley's claim that the registration search results came back "no record," which casts doubt on McKinley's representation about when he learned that Bey and his friends were black. Further, Eisenbeis' police report indicates that McKinley learned of the men's race *before* arriving at the Meijer, directly contradicting McKinley's account. For purposes of this appeal, the Court must view this disputed evidence in the light most favorable to Bey and assume that McKinley learned that Bey and his companions were black prior to arriving at the Meijer. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2]As stated in footnote 1, *supra*, there is a factual dispute about whether the SOU officers ever actually ran the license plate through the database and received a "no record" result. As the majority observes, Defendants have not presented any evidence—such as an audio recording of the call to the dispatcher or a computer printout of the search results—to support McKinley's testimony that the SOU officers ran the license place through the database and received a "no record" reading. Further, as the majority states, Eisenbeis testified that the problem with the license plate was that it was "unreadable," which differs from McKinley's testimony regarding the alleged "no record" result. (*See* Eisenbeis Dep., R. 46-5 at PageID #940, p. 9.)

(*Id.* at PageID #438, p. 18.)  Despite not observing Bey and his friends engaging in any criminal activity, the SOU officers continued "just watching" the men "to see if, you know, something else should maybe happen or occur."  (*Id.*)

Even though there was no indication that the men had engaged in any suspicious activity while inside the Livonia Meijer, the SOU officers continued to surveil the men after they left the store.  They monitored Bey and his friends as they drove to the parking lot of the abandoned Livonia Walmart, where they parked the van and used their cell phones to locate a 24-hour store where they could purchase space heaters.  The officers did not notice any suspicious activity while the van was parked.

Despite the lack of suspicious activity, the SOU officers continued to monitor the men after they left the parking lot.  In fact, the SOU officers pursued the men through three jurisdictions.  They followed Bey and his friends as they drove westbound on I-96, turned onto Northbound I-275, exited at Six Mile Road—the first exit—and got back on I-275 traveling Southbound through Plymouth Charter Township, exited at Ford Road in Canton, and eventually arrived at the Canton Walmart.  According to the majority opinion, the SOU officers perceived Bey's exiting and re-entering the highway as a "cleaning move" designed to detect or evade his pursuers. (Maj. Op. at 3.)  However, it seems more likely that Bey had simply made a wrong turn and corrected his error at the first opportunity by turning around at Six Mile Road.[3]

Bey and his friends entered the Canton Walmart.  McKinley directed McAteer to follow the men inside to surveil them.  Once inside, McAteer kept close watch on the men and relayed her observations to McKinley via cell phone.

When Bey and his friends arrived at the Canton Walmart, the SOU officers had not observed any objectively suspicious behavior.  But McKinley called a friend who worked for the Canton Police Department to provide "an overview of what we had in Livonia and how it came to Canton, you know, so they would have a history of what just occurred."  (McKinley Dep., R. 38-6 at PageID #441, p. 33.)  McKinley also directed Eisenbeis to request that a uniformed

---

[3]In fact, Eisenbeis testified that Bey and his friends did not do "anything strange or peculiar" as they drove from Livonia to Canton.  (Eisenbeis Dep., R. 46-5 at PageID #944, pp. 22–23.)

Canton officer "make contact with these guys." (*Id.* at PageID #443, p. 38.) On McKinley's instructions, Eisenbeis called Canton dispatch. Eisenbeis explained that "we had followed this vehicle from our city, that it appeared suspicious based on our observations and [we] asked if [Canton officers] could effect a stop on the vehicle." (Eisenbeis Dep., R. 46-5 at PageID #945, p. 29.)

McKinley later explained that he decided to "make contact" with Bey and his friends because of "everything [that had occurred] from Livonia based up until Canton." (McKinley Dep., R. 38-6 at PageID #443, p. 38.) McKinley wanted to "get identification. That was our first intent, to get these people identified. You know, maybe they're part of a crew. This could be intelligence that we could use later through identification. Maybe they were involved in something in another city and, you know, information sharing." (*Id.* at PageID #444, p. 43.) McKinley also wanted Bey and his friends to explain "what they've done." (*Id.* at PageID #444, p. 44.) Specifically, McKinley wanted the men to disclose "where [they are] coming from, where they're going, are they shopping, what are they doing to maybe kind of paint us a picture if this is something we should be concerned with or if it's nothing." (*Id.*) McKinley suspected that Bey and his friends might have been involved in "something else, some other criminal activity" and might have been part of "a retail fraud crew" or a "credit card fraud crew." (*Id.* at PageID #444–45, pp. 45–46.) He thought that making contact with the men could enable "information sharing through different departments and that might shore up . . . a case in Canton, in Redford, [or in] Farmington Hills." (*Id.* at PageID #445, p. 45.)

Falk, a uniformed Canton officer, received instructions from his dispatcher to proceed to the Canton Walmart. The dispatcher relayed that the men were "shopping around," which Falk understood to mean committing "retail fraud . . . because they know loss prevention or whatever you want to call it as protection is not in the store [at that early morning hour]." (Falk Dep., R. 38-11 at PageID #497, p. 20.) When Falk arrived, he briefly met with McKinley, who gave him a "prep radio" and advised Falk that an undercover SOU officer was surveilling the men inside the store. (*Id.* at PageID #495, p. 12; McKinley Dep., R. 38-6 at PageID #441, pp. 31–32.) McKinley gave Falk the radio so that Falk could "hear what's going on through me." (McKinley Dep., R. 38-6 at PageID #441, p. 32.) As McKinley explained, "I'm on the phone with

[McAteer]. She's talking to me through the cell phone and I'm just updating the guys [Falk and Eisenbeis] on our police radio." (*Id.* at PageID #441, pp. 30–31.) In other words, Falk and Eisenbeis did not receive information directly from McAteer—who was surveilling the men from inside—but instead received "updates" that McKinley communicated over the radio based on what McKinley purportedly heard from McAteer.

While surveilling Bey and his companions, McAteer saw the men visit the electronics section, where "nothing in particular st[ood] out" to her. (McAteer Dep., R. 47-8 at PageID #1311, p. 22.) She also witnessed one of the men "in the hunting section inquiring about guns." (*Id.* at PageID #1310, p. 20.) McAteer observed items in their shopping cart; she anticipated that the friends might attempt a "push out," i.e., "fill[] up a cart full of merchandise and walk[] out of the store without paying for it." (*Id.* at PageID #1313, p. 31.) But despite McAteer's expectations, Bey and his friends did not try a push out; they walked up to the cash register to pay for their items, just like any other law-abiding customers. McAteer claims that she observed Bey "shuffling" through "a stack of several [credit] cards" prior to selecting a card and giving it to the cashier, which she believed could have indicated that Bey was committing credit card fraud. (*Id.* at PageID #1314, pp. 34–35.) But the men paid for the items and left the store without incident. McAteer did not observe any suspicious activity as the men exited the Walmart.

The officers stationed outside gave conflicting accounts of the nature and extent of the information that McKinley relayed to them over the radio. According to Falk, McKinley conveyed that Bey and his friends "ha[d] a cart full of merchandise and that they think they're going to do a push out," i.e., commit "a retail fraud." (Falk Dep., R. 38-11 at PageID #499, pp. 26–27.) Falk further asserts that McKinley later relayed that Bey and his friends were in line at the cash register, "going through a bunch of credit cards" and that "it looks like maybe they're going to do some kind of a credit card fraud." (*Id.*) But according to Eisenbeis, McKinley relayed only that Bey and his friends "went to a register and purchased some items with a credit card" and "were exiting the store" without incident. (Eisenbeis Dep., R. 46-5 at PageID #944, pp. 24–25.) And according to Eisenbeis, McKinley *never stated* that he believed that Bey and

his friends were attempting a "push out" and *never stated* they had been "cycling through credit cards" at the register.**4**  (*Id.* at PageID #950, p. 49.)

Bey and his friends left the store with the space heaters they had purchased and got into the parked van.  McKinley requested that Falk effectuate a stop.  Falk pulled his marked cruiser up to the rear end of Bey's van.  Falk did not stop Bey because of the possible license plate violation.  According to Falk, this was not a traffic stop and Bey and his companions were not free to leave.  Two other marked Canton cruisers also converged on the scene.  Falk ordered Bey to open the door and exit the van.  Bey complied.

Falk informed Bey that he was investigating retail or credit card fraud that Bey and his friends might have committed inside the store.  Bey gave Falk the receipt for the space heaters and the credit card he used for the purchase.  Falk matched the receipt to the credit card, determined that Bey's purchases were "lawful," and confirmed that Bey had not committed retail fraud, credit card fraud, or any other crime inside the Canton Walmart. (Falk Dep. R. 38-11 at PageID #504, p. 46.)

As Bey was following Falk's order to exit the vehicle, Bey informed Falk that he had a gun.  Falk confiscated the weapon for "everybody['s]" safety.  (*Id.* at PageID #503, p. 45.)  Bey gave Falk his Concealed Weapons Permit License.  Because the license had expired, Falk arrested Bey for a felony offense of carrying a firearm without a valid license.

In the resulting state criminal case, Bey filed a motion to suppress.  Falk, the only officer to testify at the suppression hearing, admitted that he did not personally observe any conduct that gave rise to reasonable suspicion.  Falk stated that he only stopped Bey because the SOU officers asked him to.  After hearing Falk's testimony, the trial judge remarked that "I'm thinking we're in Russia or something" and explained that this case was a "no-brainer" because "there was absolutely no reason in the world to stop these people."  (Suppression Hr'g Tr., R. 46-8 at

---

**4**The majority fails to acknowledge these factual discrepancies.  But the officers' differing accounts matter. As discussed below with reference to the collective knowledge doctrine, these discrepancies cast doubt on Falk's argument—and the majority's conclusion—that Falk lacked enough information to determine that there was no objective basis for stopping Bey.

PageID #1003–02, pp. 17–18.)  The trial judge granted the motion to suppress and dismissed the charge against Bey.

## II.  DISCUSSION

The majority concludes that all of the Defendants except for McKinley are entitled to qualified immunity, and even then, only begrudgingly finds that McKinley has to face trial thanks to a jurisdictional technicality.  On some level, this might seem like the sort of balanced decision-making we expect from the federal judiciary.  After all, McKinley will face trial, and so Bey will still have his day in court.  And in a close case, some officers receiving qualified immunity and others going to trial might be a plausible outcome.

But this is not a close case.  The officers in question followed Bey and his friends from store to store, observed ever-increasing signs of their innocence, and nevertheless stopped them and forced Bey to justify his lawful actions.  The only explanation for the officers' behavior was the color of Bey's skin.  To avoid this uncomfortable reality, the majority views the facts through a distorted lens that improperly favors Defendants, and the legal conclusions that result from this choice are predictably nonsensical.  Because Bey has presented sufficient evidence for a jury to conclude that each of the officers violated his clearly established equal protection and Fourth Amendment rights, qualified immunity does not shield Defendants from Bey's constitutional claims.

### A.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The [Equal Protection] Clause embodies the principle that all persons similarly situated should be treated alike."  *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  It is paradigmatic that "[t]he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

To prove an equal protection violation, a plaintiff must demonstrate "that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990) (quoting *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989) (en banc), *abrogated on other grounds by Hudson v. McMillian*, 503 U.S. 1 (1992)). A plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). "[D]iscrimination can be proved through direct evidence, which seldom exists, or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) (citing *United States v. Travis*, 62 F.3d 170, 174 (6th Cir. 1995)); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 571 (6th Cir. 2011) ("Direct or circumstantial evidence . . . may establish an Equal Protection Clause violation."); *United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir. 2000) (noting that a plaintiff could prove "by requisite direct, circumstantial, or statistical evidence, that he was a target of racial profiling"). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . ." *Davis*, 426 U.S. at 242.

This Court held over twenty years ago that "[t]he Fourteenth Amendment . . . prohibits agents from engaging in investigative surveillance of an individual based solely on impermissible factors such as race." *Avery*, 137 F.3d at 354. We explained, in unequivocal terms, that "[a] person cannot become the target of a police investigation solely on the basis of skin color." *Id.*; *see also Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 542 (6th Cir. 2002) ("[T]he Constitution forb[ids] embarking on an investigation of someone for a particular offense on the basis of that person's race.").

When evaluating a motion for summary judgment, we must "view[] [the evidence] in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). "[A]ll reasonable inferences must be made in favor of the non-moving

party." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (citing *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000)). Further, the moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986).

As the majority correctly notes, this Court's role is even more limited on an interlocutory appeal from the denial of qualified immunity. Unlike in other summary judgment appeals— which come to this Court when a district judge *grants* summary judgment and thus ends a case in its entirety—we cannot consider whether the evidence is sufficient to present a genuine issue for trial. *E.g.*, *Moldowan v. City of Warren*, 578 F.3d 351, 369–70 (6th Cir. 2009); *Farm Labor*, 308 F.3d at 536–37 (citing *Johnson v. Jones*, 515 U.S. 304, 317 (1995)). Similarly, "a defendant may not challenge the inferences the district court draws from th[e] facts, as that . . . is a prohibited fact-based appeal." *Hopper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018) (alterations in original) (quoting *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015)).

While the majority cites these principles in dismissing McKinley's appeal, it takes a complete about-face when it comes to Eisenbeis, McAteer, and Falk. The majority presents no legal authority showing the difference between McKinley's claim of qualified immunity and the claims of the other officers in this case, and instead focuses on the factual inferences that can be drawn from the record. And in doing so, the majority impermissibly views the facts in the light most favorable to the officers, characterizing their involvement as "limited and based almost entirely on the direction of others" and concluding that this somehow negates any inference of discriminatory purpose. (Maj. Op. at 18.)

Looking instead at the facts in the light most favorable to Bey, a jury could easily find that McKinley initiated surveillance of Bey and his friends because of the color of their skin. A jury could also find that the SOU officers engaged in prolonged surveillance of Bey and his friends because of their race. And a jury could find that race-based assumptions of criminality clouded the lens through which the officers perceived the information they gained through their investigative surveillance, preventing them from appreciating the obvious truth crystallizing

before them: that Bey and his friends were not criminals engaged in illicit activity, but rather law-abiding citizens simply shopping for space heaters on a cold winter evening.

The longer the SOU officers' surveillance continued, the more exonerating evidence they uncovered. The SOU officers monitored Bey and his friends as the three men (1) drove to the 24-hour Livonia Meijer, where the officers admit the men did not engage in any illicit or suspicious activity; (2) proceeded to the Livonia Walmart and, discovering it was closed, sat in their car for a brief period of time while using their phones to locate another 24-hour store, with the officers again admitting that the men did not engage in any suspicious activity; and (3) navigated to the 24-hour Canton Walmart, where they parked their van, entered the store, browsed various departments, placed items in their shopping cart, got in the checkout line, and used a credit card to pay for their purchase—in other words, where the men shopped in the same exact manner as any other customers. The fact that this lengthy series of completely innocuous conduct heightened, rather than dissipated, the SOU officers' suspicion is inexplicable—unless, of course, racial prejudice prevented the SOU officers from appreciating the obvious.

McKinley's later attempt to justify his actions suggests that he may have initiated surveillance and ordered the stop because of race. McKinley claims that he decided to surveil Bey on a "hunch" because Bey's van was "kind of beat up." (McKinley Dep., R 38-6 at #446–47, pp. 51, 54.) Many cars on the road are "kind of beat up." But elite teams of undercover police officers do not conduct protracted surveillance on every "kind of beat up" car they encounter based on an unspecified "hunch," diverting scarce resources away from other, more-pressing concerns.

McKinley also wanted to "identif[y]" Bey and his friends and have them explain "what they've done" for the purpose of gathering "intelligence." (*Id.* at PageID #444, pp. 43–44.) McKinley suspected that the men could have participated in "something else, some other criminal activity," and believed that by identifying the men he might be able to "shore up" a criminal case in a neighboring jurisdiction. (*Id.* at PageID #444–45, pp. 45–46.) But McKinley provided no objective basis for his supposed belief that Bey and his friends had engaged in illicit activity or that they were part of a criminal "crew." Based on McKinley's need for Bey and his friends to "explain" themselves, McKinley's repeated use of the euphemism "crew" to describe

the men, McKinley's nebulous desire to gather "intelligence" on Bey and his friends, and McKinley's suspicion that the men might have taken part in other unspecified "criminal activity" despite absolutely no evidence linking them to any illegal conduct, a jury could reasonably infer that McKinley surveilled the men, and ordered the stop, because of the color of their skin.

The jury could also find that Eisenbeis and McAteer acted out of racial bias. It is true that McKinley made the decision to initiate surveillance. But Eisenbeis and McAteer participated in the surveillance and investigation. Eisenbeis and McAteer followed Bey and his friends from the Livonia Meijer, to the Livonia Walmart, and all the way to the Canton Walmart. Eisenbeis called Canton dispatch and requested that a uniformed Canton officer stop Bey. McAteer, for her part, surveilled the men inside the Canton Walmart, and may have reported to McKinley that the men were about to try a "push out" or "credit card fraud," despite the fact that there was absolutely no basis—except for racial bias—for McAteer to draw this inference of criminality. The majority misconstrues the facts by suggesting that Eisenbeis and McAteer were merely bystanders. The majority is wrong. A jury could find that Eisenbeis and McAteer participated in the unconstitutional conduct by surveilling, pursuing, and helping to stop Bey on the basis of his race.

The same is true for Falk. Falk stopped Bey and his friends, even though he was aware of the utterly benign events that had taken place inside the Canton Walmart. Each piece of information that Falk heard through the prep radio should have exonerated Bey and his friends from any suspicion of criminal activity. But Falk nonetheless effectuated the stop after the men paid for the items and exited the store without incident. And even though Falk knew that the men had paid for the space heaters, Falk still demanded that Bey exit the van and provide Falk the receipt and credit card, because Falk felt the need to verify that the men had not committed a crime. A jury could find that race-based assumptions of criminality motivated Falk's actions.

This circumstantial evidence of discriminatory purpose must also be viewed in light of the statistical evidence offered by Bey. As the majority notes, Bey presented evidence showing that while the population of Livonia is only 3.4% black, 53% of people arrested by Livonia police are black. For Canton, 4.54% of the population is black, but so are 34% of those arrested. And in both jurisdictions, the police forces are overwhelmingly white.

While the majority mentions this evidence when dismissing McKinley's appeal, it somehow disappears from the discussion when the majority turns to the other officers. To be clear, those officers' actions were already highly suspect. But this statistical evidence provides even further support for the inference that any reasonable viewer of these facts could have already drawn: that Bey and his friends would never have been followed and stopped if they were white.

The majority ignores this evidence and skews the facts in favor of Defendants, butchering the standard for summary judgment and disregarding our limited role in reviewing a denial of qualified immunity. But by far the most disturbing aspect of the majority's deeply flawed opinion is the deleterious impact it may have on future civil rights plaintiffs seeking to hold police officers accountable for alleged racial discrimination. Because direct evidence of racial discrimination "seldom exists," most plaintiffs must attempt to prove discrimination by inferences drawn from relevant statistical or circumstantial evidence. *Avery*, 137 F.3d at 355. And because a plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose," *Kemp*, 481 U.S. at 292, statistical evidence alone will rarely suffice to establish an inference of discrimination.

This leaves only one avenue for most plaintiffs: drawing an inference of discrimination through circumstantial evidence. But the majority imposes a near categorical barrier on plaintiffs seeking to draw such an inference. One would strain to imagine a scenario where more circumstantial evidence would exist, than is present in this case, that police officers targeted, surveilled, and ultimately stopped persons solely because of the color of their skin. Nonetheless, the majority concludes (or in McKinley's case, strongly suggests) that Bey's powerful circumstantial evidence is not enough, that something more is needed before an inference of discrimination may reasonably be drawn. And so Bey's civil rights fall by the wayside, taking this Court's summary judgment standard and common sense down with them.

In their highest form, federal courts protect and vindicate constitutional rights, particularly for those who have been subject to systemic discrimination and oppression. But the majority shuts the courthouse doors on a large portion of those black and brown citizens who plausibly allege that police officers targeted, surveilled, or stopped them because of their race.

In its opinion, the majority signals to police officers that they have license to conduct race-based surveillance and make race-based stops, so long as they do not admit to their true motivations. By so distorting the facts and misapplying the law to protect Defendants in this case, the majority incentivizes other officers to engage in race-based policing and commit future constitutional violations.

**B.  Fourth Amendment**

The majority also holds that officers Eisenbeis, McAteer, and Falk are entitled to qualified immunity on Bey's Fourth Amendment claim.  In reaching this erroneous conclusion, the majority improperly applies the case law regarding permissible public surveillance and extends the collective knowledge doctrine to a context where it does not belong.  Contrary to the majority's holding, a reasonable jury could find that Eisenbeis, McAteer, and Falk violated Bey's clearly established Fourth Amendment rights by subjecting him to a non-consensual investigative detention without reasonable suspicion.  Accordingly, qualified immunity does not protect Eisenbeis, McAteer, and Falk from Bey's Fourth Amendment claims.

The majority finds that Eisenbeis' and McAteer's conduct did not implicate the Fourth Amendment at all because Eisenbeis and McAteer merely participated in nonintrusive public surveillance.  In support of this conclusion, the majority cites language from various cases stating that police officers do not need an objective basis for observing people and things placed in public view.  *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 32 (2001) ("[T]he lawfulness of warrantless visual surveillance of a home has . . . been preserved."); *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *United States v. Houston*, 813 F.3d 282, 289 (6th Cir. 2016) ("[P]olice may view what the public may reasonably be expected to view.").

But because the majority fails to adequately acknowledge that this case is about race, it distorts the relevant inquiry.  The question is not whether police officers can observe people and things in public places; the answer to this question is, quite obviously, "yes."  It is whether officers can surveil and stop someone based solely on that person's race.  The answer to this

question is, quite obviously, "no." *See, e.g.*, *United States v. Anderson*, 923 F.2d 450, 455 (6th Cir. 1991) ("[S]uspicions based solely on the race of the person stopped cannot give rise to a reasonable suspicion justifying a *Terry* stop." (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975))).

The majority's strained attempt to exonerate Eisenbeis and McAteer suffers from another fundamental flaw. The majority holds that Eisenbeis and McAteer did not violate Bey's Fourth Amendment rights because they did not "personally participate[]" in the stop. (Maj. Op. at 9.) But the majority minimizes Eisenbeis' and McAteer's conduct and ignores the central roles they played in the efforts to stop Bey. Of course, we must assess whether each officer is entitled to qualified immunity and not, as the majority states, "lump" the officers together. (*Id.*) But in its examination of each officer's conduct, the majority loses sight of the larger factual context in which the officers acted.

It is true that Eisenbeis and McAteer did not themselves order, or conduct, the stop. But they each played vital roles in the conduct that culminated in the stop. They surveilled and pursued Bey and his friends from Livonia to Canton. Eisenbeis called Canton dispatch to request that a Canton officer make contact with Bey and his companions. And McAteer followed the men inside the store and provided contemporaneous reports about their alleged actions. For these reasons, the majority's analogy to *Burley v. Gagacki*, 729 F.3d 610 (6th Cir. 2013), obviously fails. Eisenbeis and McAteer were not simply "present" at the scene of a Fourth Amendment violation; they actively violated Bey's constitutional rights. And at any point during the prolonged surveillance, Eisenbeis and McAteer could have voiced their doubts about the necessity of surveilling and stopping Bey based on McKinley's "hunch."

Viewing the evidence in Bey's favor, as we must do at this point in the proceedings, Eisenbeis and McAteer engaged in a course of conduct through which the SOU officers, acting in concert, surveilled and stopped Bey because of his race. The majority's myopic analysis loses sight of the larger factual context in which Eisenbeis and McAteer acted. Because a jury could find that the SOU officers acted together to surveil and stop Bey, Eisenbeis and McAteer are not entitled to qualified immunity.

The majority also concludes that qualified immunity protects Falk from Bey's Fourth Amendment claim. This is because, the majority insists, this case falls under the collective knowledge doctrine, and so Falk cannot be held responsible because he acted based on the directions he received from McKinley and the other officers. But because the majority misunderstands the purpose of the collective knowledge doctrine, it erroneously concludes that the collective knowledge doctrine shields Falk as a matter of law. It does not.

The collective knowledge doctrine reflects the principle that "[r]esponding officers are entitled to presume the accuracy of the information furnished to them by other law enforcement personnel." *United States v. Lyons*, 687 F.3d 754, 769 (6th Cir. 2012). It also "recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *Id.* at 766 (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)). Because officers often need to "'act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information,' we impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Id.* (alteration in original) (quoting *Hensley*, 469 U.S. at 231). When analyzing whether the collective knowledge doctrine applies, this Court must determine "what information that officer [invoking the collective knowledge doctrine] was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007).

The collective knowledge doctrine is most applicable in a quickly unfolding situation, in which the responding officer possesses little or no knowledge of the facts giving rise to reasonable suspicion and lacks the ability to independently corroborate that information. For instance, in *Lyons*, we held that the collective knowledge doctrine protected state troopers who stopped a vehicle containing contraband upon a request from the DEA. 687 F.3d at 765–69. We emphasized that "the troopers made no attempt to develop or to otherwise confirm the facts underlying the DEA's request, but instead objectively relied entirely on unverified information furnished to them by fellow law enforcement." *Id.* at 768. We found that the collective knowledge doctrine "clearly" applied because the state troopers had no independent knowledge

of the events giving rise to reasonable suspicion and no ability to verify or confirm the basis for the DEA's request that they stop the vehicle. *Id.* Similarly, in *Hardesty v. Hamburg Township*, 461 F.3d 646, 656 (6th Cir. 2006), *abrogated on other grounds by Florida v. Jardines*, 569 U.S. 1 (2013), we held that the collective knowledge doctrine protected the Pinckney officers who entered a home without a warrant because they relied completely "upon the information provided by the Hamburg officers that an individual in the house appeared unconscious and bleeding." Like *Lyons*, *Hardesty* involved a straightforward application of the collective knowledge doctrine: the Pinckney officers lacked any independent information about the circumstances allegedly necessitating the warrantless entry and merely acted on the statements provided by the Hamburg officers that someone inside required urgent medical attention. *Id.*

The collective knowledge doctrine does not apply here. This case does not involve an officer who responded to a quickly unfolding situation and acted without independent knowledge. Instead, Falk himself was involved in the surveillance and investigation at the Canton Walmart. He received McKinley's radio updates and knew what Bey and his friends were doing inside the store. Falk could have—and should have—determined for himself whether reasonable suspicion existed for a stop. Unlike the state troopers in *Lyons* and the Pickney officers in *Hardesty*, who had minimal information and lacked any reason to doubt the constitutionality of police intervention, Falk may have had reason to know that no objective basis existed to stop Bey. Viewing the facts in the light most favorable to Bey, Falk knew that Bey and his friends placed items in their shopping cart, proceeded to the checkout, paid for the items without incident, and exited the store just like any other law-abiding customers. Just as a jury could find that McKinley lacked reasonable suspicion to order the stop, a jury could similarly conclude that Falk possessed sufficient information, based on the details that McKinley conveyed to him, to know that the stop was not justified.

In holding that the collective knowledge doctrine protects Falk as a matter of law, the majority gets the collective knowledge doctrine backwards. The majority correctly explains that the collective knowledge doctrine applies where the responding officer is completely unaware of the facts giving rise to reasonable suspicion or where, in the majority's words, the information received by the responding officer is "quite skimpy." (Maj. Op. at 12.) But the majority fails to

appreciate that the problem in this case is not that Falk had too little information—it is that he had too much.

The majority apparently believes that as the level of information possessed by the responding officer increases, the collective knowledge doctrine becomes more applicable. But the opposite is true. When a responding officer obtains substantial information about the circumstances allegedly warranting a stop, his blind reliance on orders from other officers to conduct a stop becomes less reasonable. The collective knowledge doctrine protects officers who lack reason to doubt the veracity of information supplied to them by other officers. The majority distorts the doctrine to protect officers who have more than enough information to know that a stop is unconstitutional but choose to conduct the stop anyway.

A jury could find that Falk knew, or should have known, that no reasonable suspicion existed to stop Bey. As a result, Falk's reliance on McKinley's request to stop Bey was not reasonable and the collective knowledge doctrine does not apply. *See Mabry*, 482 F.3d at 848. The majority erroneously extends the doctrine to protect Falk simply because he executed the stop at McKinley's request, even though he should have known that McKinely's request violated Bey's civil rights. This blanket endorsement of a following-orders defense cannot be the law.

## III. CONCLUSION

This case is not about what my colleagues believe may have transpired on the evening of March 16, 2013. It is about whether a reasonable jury could determine that Defendants violated Bey's constitutional rights. As explained above, a jury could find that Defendants violated Bey's clearly established equal protection and Fourth Amendment rights by surveilling, investigating, and stopping him without any objective justification and solely because of his race. But in granting summary judgment to several of the officers who followed and stopped Bey despite having zero evidence of wrongdoing, the majority usurps the role of the jury and imposes its own misguided view of the facts. Even worse, the majority employs novel and indefensible legal reasoning that substantially and unjustifiably narrows the scope of the Equal Protection Clause. And, most egregiously, the majority turns a blind eye to race-based policing that violates the constitutional rights of black and brown Americans. I therefore dissent.